OPINION
Mazzone, D.J.
This is a diversity action to enforce an alleged contract to purchase manufacturing and control equipment known as an AccuRay 2000 system. Litigation was commenced in Suffolk County Superior Court and removed shortly after to'this Court, pursuant to 28 U.S.C. § 1446. Jurisdiction is properly invoked pursuant to 28 U.S.C. §§ 1332 and 1441.
Briefly, the complaint alleges that on December 30, 1974, Futura Fabrics, a manufacturing company producing knitted synthetic fabrics, entered into a lease agreement (Lease) with AccuRay Leasing Corporation (AccuRay) to lease an AccuRay 2000 system at a rate of $12,460 a month for 96 months.[1] The complaint further alleges that the Lease incorporated a letter from AccuRay to Futura, also dated December 30, 1974, which gave Futura the right to convert the *446 Lease to a purchase of the system at a fair market value. AccuRay denied that the letter of December 30, 1974 was a part of the Lease, or that the letter granted a binding option to purchase the system. Chelsea seeks, first, a declaration of its rights under the Lease'j'that the letter of, December 30, 1974 is an enforceable agreement, and secondly, to enforce that agreement.
The case was tried to the Court without jury. Pursuant to Fed. R. Civ. P. 52(a), I make the following findings and conclusions.
I.
The AccuRay 2000 system is an advanced computer-based system which is able to monitor and control production in the textile, rubber and paper industries. In the textile industry, the system, by adjusting the width and weight of the fabric, improves the piece-to-piece and within-piece yield variation and, thereby greatly facilitates the uniform production of large pieces of fabric and fabric integrity and quality. Futura, a manufacturer and processor of textiles, became interested in the system earlier in 1974. It had received a proposal from AccuRay which dealt extensively with the applicability of the system to Futura’s needs. Futura expected that the system would increase its profitability by over $1,000,000 or more per year, depending upon the amount of fabric sold.
On December 30, 1974, after a long period of negotiation, the parties executed the Lease. The negotiations had focused on three aspects: (1) obsolescence of the system; (2) financing; and (3) the investment tax credit. Futura was concerned that the rapid advance in computer technology would soon render the system obsolete. George Hanscom, the Comptroller at Chelsea, sought the right to terminate any agreement if the system proved obsolete or business conditions changed. AccuRay declined to allow termination on these grounds, but it agreed to -a six-month trial period in which its guarantee of increased productivity and profits could be assessed. The parties agreed that the Lease could not be terminated if business conditions deteriorated or the system became obsolete, but the Lease could be terminated if the system performed at less than evaluated. This “get-out” provision was acceptable to Futura and incorporated specifically in the Lease as Operations Result Evaluation-Amendment Number One.
Futura also negotiated successfully for the investment tax credit, which, Under IRS regulations, could go to either the lessor or lessee. AccuRay assented to this request on the condition that the deal be finalized by the end of 1974.
Finally, Futura explored three ways to finance the system, an outright purchase, third-party financing, or a lease agreement with AccuRay itself. AccuRay preferred an outright purchase, or third-party financing, but Futura chose a lease agreement. Even though this option was more costly, Futura thought it would obtain better service from AccuRay if they maintained a direct relationship. However,' Futura anticipated that it would want the right to purchase the system at some point, and therefore, it sought an option to convert the lease to a purchase as part of the Lease. AccuRay agreed to provide a letter stating its conversion policy. This letter was not referred to in the Lease nor incorporated specifically in the Lease.
The closing was held at AccuRay’s offices in New York City. AccuRay representatives presented a binder of documents to Ronald Casty, then the vice president for administration and now the president of Chelsea. Casty was the senior official from Chelsea at the closing. He had taken part in the earlier negotiations and was familiar with the details of the Lease. The closing occurred without incident. Casty conferred briefly over the phone with counsel and then signed the Lease. The binder included documents entitled Lease Agreement, Operating Results Evaluation, Service Maintenance Agreembnt, a letter allocating the investment tax credit to Futura, and a letter describing the conversion policy.
*447 Casty forwarded a copy of the tease to his staff on January 21, 1975. He described the contents by their titles, but referred to the conversion letter as a “side letter of buy out.”
-The system was delivered and installed . at the Futura plant located in Hazelton, Pennsylvania. After the established trial period, and an extension of that period agreed to by the parties, Futura accepted the AccuRay 2000 system on December 4, 1975 stating that the system had met “our mutually established goals.” Futura never indicated any dissatisfaction with the performance of the system during the “get-out” period. It never asserted that the system did not perform as represented.
In June, 1976, after Futura accepted the system, AccuRay assigned the Lease to the First National State Bank of New Jersey. AccuRay’s right to assign was part of the Lease and Chelsea was properly notified of the assignment.[2]
The next few years showed a sharp decline in the market for knitted , synthetic fabrics. The sales of Futura’s broad group declined, continuing into 1977. In 1978, Chelsea decided to discontinue operations at Futura’s plant in Hazelton, Pennsylvania.
In March, 1978, Futura inquired for the first time into the cost of converting the Lease into a purchase. AccuRay responded that as of April, 1978, the price would be approximately $602,725, referring to the schedule set out in the conversion letter. Futura did not pursue the matter, nor did it claim that it had a right to purchase at that time. It continued to make the monthly payments called for under the Lease.
In March, 1979, Futura asserted that it had a right to purchase the system for the first time. It requested that AccuRay state the fair market value of the system which, it claimed, was the cost of the system as set out in the letter of December 30, 1974. AccuRay promptly denied the “right” but suggested a conversion price of $472,863.53, again refer- ' ring to the conversion letter, but reducing , the amount by some $27,000. Futura did not agree that the figure represented the “fair market value.” However, it forwarded an amoiint equal to the monthly Lease payment and directed that the payment should be applied towards the purchase price, once one had been determined. AccuRay accepted the check, but replied that the acceptance of the check would not be taken as an admission of Chelsea’s assertion of its rights.
Chelsea made monthly payments until December, 1980, a total of $261,660 after it asserted its claim in March, 1979. In December, 1980, it stopped making payments. There are 24 payments remaining to be made under the Lease. The system is still in Chelsea’s possession.
II.
The principal, and dispositive, issues are: (1) was the letter of December 30, 1974 a part of the Lease; and (2) if not part of the Lease, was the letter an enforceable option contract.
(1) The Letter As Part of the Lease
The first question is whether the letter is part of the Lease. I conclude and rule that it is not. This ruling is governed by the parol evidence rule set out in U.C.C. § 2-201, Ohio Rev. Code § 1302.05 which states:
Terms...which are...set forth in writing intended by the parties as a final expression of their agree- - ment with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement.
My examination of the Lease persuades me that the parties intended the Lease to be the final expression of their agreemeht.
*448 The Lease contains the following paragraph:
The provisions of this Lease Agreement -constitute the full and complete agreement between Customer and AccuRay, and any terms or conditions contained in any document not expressly incorporated herein are not part of this agreement.
This is the classic merger clause. It is clear, unambiguous, and prevents the introduction of any additional evidence of any other matter. The parties were aware of the merger provision at the time they signed the document. The printed contract form contains additions and deletions which indicate that the language in the form was the subject of agreement between the parties. Whenever the parties agreed to amend the Lease they provided a clear and specific method to do so. They so provided with the document entitled “Operation Results Evaluation-Amendment Number One” signed by both patties and clearly identifying itself as an amendment to the Lease.
The simple conclusion is that if the parties had intended that the conversion letter was to be a part of the Lease, it would have been treated in the same manner as the amendment. They did not so treat it. The parties must be bound by the provisions as stated. Atlas Shoe Co. v. Bloom, 209 Mass. 563, 567-568 (1911).
(2) Is the Letter an Enforceable Option Contract.
The inquiry does not end with a finding that the letter itself was not part of the Lease. If the letter meets the requirements for the formation of a contract, it can still be construed as a separate option contract. See, Restatement on Contracts, Second, §§ 25, 213.
The letter states that it is AccuRay’s policy to allow conversion from a lease to a purchase. Defendant argues that the use of the word “policy” shows that it did not intend to make a firm promise concerning its future conduct. Whether the use of the word “policy” creates a binding commitment depends on the context in which it is uséd. In Rehor v. Case Western Reserve University, 43 Ohio St. 2d 224, 331 N.E.2d 416 (1975, cert. denied, 423 U.S. 1018 (1975)), the Court found that the “policies” of the University were included in a professor’s employment contract. The Court permitted the University to alter its retirement policy, not because it was a “policy,” but because it found that there was a specific written understanding, evidenced by a writing, within the community that the retirement policy should be changed if needed. 331 N.E.2d at 421.
Here, there is a similar understanding. The evidence adduced at trial shows that' Futura wanted an option to purchase, and that AccuRay accordingly provided the letter at the closing. AccuRay permit-: ted the conversion Futura sought, but under conditions and at a price to be determined according to future considerations including the unexpired time of the Lease. This flexibility was the only means which AccuRay possessed to protect its interest, since it had assigned its rights under the Lease and would have been responsible for any default. There was supporting testimony at trial consisting of the “crossover” points at which conversion was practical and advisable for the parties. It is also noteworthy that in March, 1978, Futura sought to convert, but abandoned its request, insisting neither that the option was binding or that the cost was' fair market value.
The conversion letter was the result of negotiations between competent and knowledgeable parties.[3] ■ Counsel was consulted, financial considerations discussed, and there were changes made and initialed at the closing to show any final deviations from the prepared form.
*449 Under these circumstances, it is inconceivable that this letter was intended to create a binding option which AccuRay was powerless to change and which would have been totally inconsistent with the Lease itself. Rather, it was intended as a statement of policy, describing the conditions under which the parties could agree to a conversion to a purchase if such a purchase was advisable under the existing circumstances.
• One final note remains to be stated. Under all the conditions described above, even if the letter of December 30, 1974 were to be considered an enforceable option, it was not validly exercised by Futura. There was no agreement that the monthly payments could be applied to a purchase price and, when the price was finally determined, the letter itself required that the entire price was to be paid in full on the date the conversion took place. Chelsea never made any such tender of performance, nor did it pursue at any time any efforts to determine a fair market value for the system.
On the contrary, the only valid action taken in response to Futura’s assertion was AccuRay’s response granting the conversion at a price $27,000 less than the maximum which could have been charged under the schedule set forth in the letter. It was also substantially less than the total of the remaining payments under the Lease. Chelsea simply did not take advantage of the opportunity at that time, nor at any time up to the time of trial, to tender any performance to establish a price for the conversion.
Conclusion
In summary, the plaintiff has failed to sustain its burden of proof by a preponderance of the evidence that (1) the letter of December 30, 1974 was part of the Lease and (2) the letter of December 30, 1974 was an enforceable option contract.[4]
Accordingly, judgment is to be entered for the defendant and the complaint dismissed.
SO ORDERED.
A. David Mazzone United States District Judge

. Futura Fabrics is a division of Chelsea Industries, Inc. (Chelsea). It assigned its rights to Chelsea on April 17, 1979.

. First National State Bank of New Jersey was originally a defendant in this action. It was dismissed as a defendant because of lack of jurisdiction. See, Memorandum and Order, August 30, 1979.

. In any case.tried without a jury, the court is required to assess the credibility of the witnesses and determine the weight to be given the testimony. The account of the closing provided by Mr. Casty was not convincing nor was his testimony in general. He was hesitant and equivocal when pressed. His memory was uncertain and, in many respects, his testimony was inconsistent with the documentary evidence.

. I have termed the issues as dispositive only in the context of the present pleadings. I recognize there are other questions Having to do with the completion of the performance of the contract that remain ünresolved, but, as I see it, those questions were not presented to the Court.